# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| DESYREE H., <br><br> Plaintiff, <br><br> v. <br><br> NANCY A. BERRYHILL, Deputy Commissioner of Operations, performing duties and functions not reserved to the Commissioner of Social Security, <br><br> Defendant. | Case No. CV 17-08897-DFM <br><br> MEMORANDUM OPINION AND ORDER |

Desyree H. ("Plaintiff") appeals from the Social Security Commissioner's final decision denying her application for Supplemental Security Income ("SSI").[1] The Commissioner's decision is affirmed.

## I. BACKGROUND

Plaintiff received disability benefits as a child; as required by law, her eligibility was redetermined when she reached age 18. See Administrative Record ("AR") 17. In 2014, it was determined that Plaintiff was no longer

---

[1] The Court partially redacts Plaintiff's name in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

disabled. See id. This determination was upheld upon reconsideration by a disability hearing officer. Id. Plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ"). See AR 36-48. The ALJ heard testimony from Plaintiff and an impartial vocational expert ("VE"). See id.

On November 7, 2016, the ALJ issued a decision finding that Plaintiff was not eligible for disability benefits. See AR 17-28. The ALJ found that Plaintiff had the following severe impairments: bipolar disorder, history of attention deficit hyperactivity disorder, history of oppositional defiant disorder, history of explosive disorder, borderline personality disorder, affective disorder, mood disorder, depressive disorder, and generalized anxiety disorder. See AR 19. The ALJ found that none of these impairments met or medically equaled a listing. See AR 20. The ALJ also found that Plaintiff retained the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following non-exertional limitations: she could understand, remember, and carry out simple job instructions, but would be unable to perform work that required directing others, abstract thought, or planning; she could maintain attention and concentration to perform non-complex routine tasks in a work environment free of fast-paced production requirements; and she could have occasional interaction with the general public. See AR 23.

The ALJ determined that Plaintiff could perform jobs that exist in significant numbers in the national economy, such as cleaner (DOT 323.687-014), small parts assembler (DOT 706.684-022), and hand packager (DOT 920.587.018). See AR 26-27. Accordingly, the ALJ determined that Plaintiff's disability ended on February 1, 2014, and she had not become disabled again since that date. See AR 28.

The Appeals Council denied review of the ALJ's decision, which became the final decision of the Commissioner. See AR 1-3. This action followed. See Dkt. 1.

## II. DISCUSSION

The parties dispute whether the ALJ erred in: (1) failing to find that Plaintiff's diabetes was a severe impairment, (2) failing to obtain medical expert testimony to determine if Plaintiff's mental impairments met a listing, (3) formulating the RFC, and (4) assessing Plaintiff' subjective symptom testimony. See Dkt. 19, Joint Stipulation ("JS").

### A. Whether Plaintiff's Diabetes Was a Severe Impairment

Plaintiff argues that the ALJ should have found that her diabetes is a severe impairment. See JS at 23-24.[2] In support of her argument, she cites records noting her diabetes, her high blood sugar levels at four medical visits between October 2012 and April 2016, and her general compliance with her medication. See id. (citing AR 239, 248, 252, 352, 365, 389).

"In step two of the disability determination, an ALJ must determine whether the claimant has a medically severe impairment or combination of impairments." Keyser v. Comm'r Soc. Sec. Admin., 648 F.3d 721, 725 (9th Cir. 2011). Severe impairments have more than a minimal effect on an individual's ability to perform basic work activities. See Webb v. Barnhart, 433 F.3d 683, 686-87 (9th Cir. 2005). The inquiry at this stage is "a de minimis screening device to dispose of groundless claims." Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996). An impairment may be found to be not severe when "medical evidence establishes only a slight abnormality or a combination

---

[2] Plaintiff also references her asthma and obesity (see JS at 24), but her argument about the severity of these impairments is conclusory.

of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." Social Security Ruling ("SSR") 85-28.

Here, the ALJ noted that while Plaintiff was evaluated for her diabetes, she received only "sparse and conservative treatment." AR 19-20 (citing AR 251, 377). The Court agrees with the ALJ that Plaintiff has not met her burden of demonstrating that her diabetes is a severe impairment. Nowhere in the record does Plaintiff allege that she is disabled because of her diabetes or that it has any effect on her ability to perform basic work activities. On the contrary, at the hearing, she did not mention her diabetes, except when asked whether she was taking insulin. AR 40. When asked to list all physical or mental conditions that limited her ability to work, she did not mention diabetes. See AR 166. In her function report, she did not mention diabetes, and when asked about how her conditions affected her abilities, she did not identify any physical limitations. See AR 178-86. The ALJ therefore did not err in finding her diabetes to be non-severe.

**B.** **Necessity of Medical Expert Testimony**

Relying on SSR 96-6p, Plaintiff argues that the ALJ should have utilized a medical expert, because additional medical evidence may have changed the non-examining physicians' findings on whether Plaintiff's mental impairments met or equaled a listing. See JS at 6, 21-22.

SSR 96-6p states that the ALJ, not an agency medical consultant, "is responsible for deciding the ultimate legal question whether a listing is met or equaled," but also states that "longstanding policy requires that the judgment of a physician . . . designated by the Commissioner on the issue of equivalence on the evidence before the [ALJ] . . . must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180,

at *3 (July 2, 1996).³ If an ALJ finds an impairment is not equivalent to a Listing, the ALJ may satisfy the expert opinion requirement by receiving into evidence a Psychiatric Review Technique ("PRT") Form signed by an agency medical consultant, ensuring that consideration has been given to equivalence at the initial and reconsideration levels of review. See id. SSR 96-6p further provides that an ALJ must obtain an updated medical opinion from a medical expert "[w]hen additional medical evidence is received that in the opinion of the [ALJ] . . . may change the State agency medical . . . consultant's findings that the impairment(s) is not equivalent in severity to any impairment in the [Listings]." Id. at 4.

Here, the record before the ALJ contained two PRT forms. The first, completed by Dr. R. Tashjian on February 7, 2014, concluded that Plaintiff did not meet or equal Listing 12.02 or 12.04. See AR 277-87. The second, completed by Dr. R. Singh on August 4, 2014, concluded likewise. See AR 325-35. Neither PRT form addressed Listing 12.08. However, Listing 12.08, like Listings 12.02 and 12.04, require a claimant to show that at least two of the following requirements are satisfied: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.⁴ 20 C.F.R.

---

³ Although SSRs do not have the force of law, they are given "some deference" because they represent the Commissioner's interpretation of Social Security's regulations. Holohan v. Massanari, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001).

⁴ Plaintiff argues that the record supports "a finding of marked limitations in interacting with others and managing herself." JS at 22. Plaintiff bases her argument on the new requirements of Listing 12.08, not those in effect at the relevant time. See Maines v. Colvin, 666 F. App'x 607, 608 (9th Cir. 2016) (holding that "the ALJ should have continued to evaluate [claimant's] application under the listings in effect at the time she filed her

§ Pt. 404, Subpt. P, App. 1. These are the "Paragraph B" criteria. Drs. Tashjian and Singh opined that Plaintiff had no more than moderate limitations in the first three Paragraph B criteria and there was "insufficient evidence" of episodes of decompensation. AR 285, 333.

Additional medical evidence was received after Drs. Tashjian and Singh completed their PRTs. Most notably, records show that Plaintiff was involuntarily hospitalized in September 2015 after she told a police officer called to respond to a physical altercation between Plaintiff and her sister that she wanted to end her life. See AR 360. The next day, she was discharged as "calm and cooperative" with no medication being prescribed. AR 372. In May 2016, Plaintiff was hospitalized involuntarily, again for being a "danger to herself" after her grandmother threatened to kick her out of the house; she was discharged two days later as alert and oriented without suicidal ideation. AR 376-77.

Plaintiff's counsel argued before the ALJ that a medical expert was warranted because the medical records supported a finding that Plaintiff met or equaled Listing 12.08. See AR 48. The ALJ's decision discussed, among other listings, whether Plaintiff met or medically equaled the criteria of Listings 12.04 and 12.08. See AR 20. The ALJ concluded that Plaintiff did not meet the Paragraph B criteria, because her mental impairments did not result in any marked limitations or repeated episodes of decompensation. See AR 21-22. The ALJ also addressed Plaintiff's hospitalizations as well as her post-PRT treatment records in his section discussing Plaintiff's RFC, showing awareness of these records. See AR 24. The ALJ noted Plaintiff's counsel's request for a

---

application"); see also AR 17 (noting that eligibility for benefits received as child is "redetermined under the rules for determining disability in adults when the claimant attain[s] age 18").

6

medical expert and concluded that there was "sufficient evidence in the medical record to make a determination." AR 17. The ALJ thus appears to have considered and rejected the contention that this additional evidence would have changed the agency medical consultants' evaluation.

Moreover, none of the new evidence included opinions that Plaintiff had "marked" difficulties or restrictions in functioning as relevant to Listing 12.08. Nor did the new records show repeated episodes of decompensation of extended duration (meaning three episodes within one year, or an average of one every four months, each lasting for at least two weeks).[5] See 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00 C.4. In sum, the ALJ's decision not to receive additional medical evidence in the form of testimony or an opinion from a psychiatric or psychological expert was consistent with the requirements of SSR 96-6p. See Roberts v. Berryhill, No. 16-158, 2018 WL 1541787, at *12 (D. Mont. May 29, 2018) (concluding that ALJ could have reasonably concluded additional medical evidence would not have changed experts' opinions, where evidence showed similar symptoms to earlier medical records and ALJ discussed the newer evidence); Rodriguez v. Colvin, No. 14-184, 2015 WL 3631697, at *12-13 (D.R.I. June 10, 2015) (finding no error in ALJ's failure to obtain updated medical expert opinion where Plaintiff submitted no medical expert opinions supporting her claim of equivalence).

---

[5] Plaintiff claims that her "total number of hospitalizations as an adult" was "around 35." JS at 22. But the testimony Plaintiff cites for this contention appears to refer to Plaintiff's hospitalizations over her lifetime. See id. (citing AR 43). Plaintiff cites only to two brief hospitalizations that occurred after the examining and reviewing physicians rendered their opinions. Furthermore, even if Plaintiff's hospitalizations could be "combined" to reflect episodes of decompensation of extended duration, Plaintiff still did not demonstrate that she had marked limitations in any of the first three Paragraph B criteria.

C.   **Plaintiff's RFC**

Plaintiff argues that the ALJ's RFC determination was not supported by substantial evidence.[6] See JS at 4-15. The Court disagrees. No physician opined that Plaintiff could not understand, remember, and carry out simple job instructions or maintain attention and concentration to perform non-complex routine tasks in a work environment free of fast-paced production requirements. In fact, the only opinions in the record support the ALJ's RFC.

Dr. Brawer examined Plaintiff and concluded that she functioned in the borderline range of general intelligence and was capable of learning simple, repetitive tasks and could likely perform some detailed, varied or complex tasks. See AR 274. He opined that her ability to sustain attention and concentration for sustained periods "may be mildly diminished" and that she demonstrated "adequate to mildly diminished" attention, concentration, persistence, and pace in completing tasks. Id. He opined that she "may" have "at least moderate limitations in ability to manage customary work stress" and would be able to work independently on basic tasks. AR 274-75. Last, he stated that she "may have mild-to-moderate limitations in sustaining cooperative relationships with co-workers and supervisors" but related

---

[6] As part of her SSR 96-6p argument, Plaintiff contends that the ALJ erred in relying on a consultative examiner and two state agency evaluators rather than Plaintiff's treating physicians. See JS at 4. Yet Plaintiff admits that she was "unable to obtain a single, summary opinion about Plaintiff's RFC from her treating physicians" and instead "relies on the record as a whole." JS at 5. Put differently, she points to no physician's opinion regarding her impairments to argue that the ALJ should have given that opinion greater weight. Thus, the Court interprets her argument to be that substantial evidence did not support the ALJ's RFC finding or that the ALJ committed legal error in assessing the RFC. See Jamerson v. Chater, 112 F.3d 1064, 1066 (9th Cir. 1997) (noting that courts "may set aside a denial of benefits only if it is not supported by substantial evidence or if it is based on legal error").

appropriately with supportive authority figures. AR 275. In February 2014, Dr. R. Tashjian concluded that Plaintiff could understand, remember, and carry out simple work tasks in a setting with reduced interpersonal contact, and assessed mild to moderate limitations in several areas. See AR 288-30. In August 2014, Dr. R. Singh reached the same conclusions. See AR 336-38.

Plaintiff notes that Dr. Brawer and the state agency evaluators did not "review records available at time of hearing." JS at 5-6, 12-13. Dr. Brawer did not review Plaintiff's medical records, but she informed him about her multiple psychiatric hospitalizations between 2006 and 2013, and he performed his own examination of Plaintiff. See AR 269. While it is unclear what records Dr. Tashjian reviewed, Plaintiff claims that Dr. Singh did not review "emergency treatment from BHC Alhambra in 2013, emergency treatment at LAC+USC Medical Center in January 2013, emergency and stabilization treatment from September 2015 to April 2016 from Exodus Urgent Care, and additional progress notes from Pacific Clinics through August 1, 2016." JS at 13. However, Dr. Singh did review records reflecting Plaintiff's aggressiveness, anger, bipolar diagnosis, impulsivity, and defiance, as well as Dr. Brawer's consultative examination which noted Plaintiff's multiple psychiatric hospitalizations as a juvenile. See AR 322.

While attacking the ALJ's RFC, Plaintiff makes a hodge-podge of unpersuasive arguments. The Court will address each in turn.

Plaintiff faults the ALJ for not specifying which of Plaintiff's subjective complaints he credited when formulating the RFC. See JS at 5. But an RFC is "based on all the relevant evidence in [the] case record," not just the claimant's testimony. 20 C.F.R. § 416.945(a)(1). Plaintiff's statements are no different than medical opinions, and the ALJ is not required to state exactly which portion of a medical opinion forms the basis for some or all of the RFC. See Wright v. Berryhill, No. 16-06203, 2018 WL 278618, at *4 (C.D. Cal. Jan. 3,

9

2018) ("The ALJ was not required to mirror Dr. Brooks's distinction between no limitations for simple tasks and moderate limitations for detailed tasks. Rather, he was simply required to consider Dr. Brooks's findings in formulating Plaintiff's mental RFC, along with the opinions of the several other relevant physician opinions. The fact that the language used was not identical is irrelevant."). Furthermore, the ALJ specifically stated what limitations he assessed due to her partially-credited subjective complaints. See AR 25.

Plaintiff also contends that the ALJ "cherry-picked" notes by two treating physicians to determine that her mental impairment was "mild." JS at 6. The ALJ cited one doctor's indication that Plaintiff's mood and behavior symptoms "mild-to-moderately interfere[d] with her daily social function" and another doctor's statement that her functional limitations were "mild." AR 26 (citing AR 311, 377). By definition, the ALJ did not cherry-pick, because Plaintiff does not cite to any other functional limitations assessed by any treating physician.

Next, Plaintiff argues that the ALJ erred in concluding that Plaintiff's GAF scores deserved little weight. See JS at 8; see also AR 26 (citing GAF scores of 41 through 50). It was not legal error for the ALJ to reject the GAF scores as anything more than "snapshots" of Plaintiff's abilities at that time. See Holt v. Colvin, No. 13-01285, 2015 WL 1275907, at *16 (E.D. Cal. Mar. 19, 2015) (noting that Ninth Circuit has determined that "failure to address the . . . GAF scores specifically does not constitute legal error," and thus ALJ's rejection of GAF score could not be legal error (citing McFarland v. Astrue, 288 F. App'x 357, 359 (9th Cir. 2008)).

Plaintiff also argues that the ALJ relied on his "own inexpert opinion" to conclude that Plaintiff's symptoms could be "effectively treated with mental health treatment." JS at 10. In fact, parts of the record demonstrate that

Plaintiff's symptoms could be effectively treated. See, e.g., AR 512 (May 7, 2014 record noting that Plaintiff is "well engaged with her plan of care, and "successfully walked away from a potential fight"), 487 (February 3, 2016 record noting that "the best way for her to improve her mental illness is by consistently taking meds and going to therapy").

Resuming her attack on Dr. Brawer, Plaintiff argues that the consulting examiner's conclusions were "varied and internally inconsistent." JS at 11. But Plaintiff's examples show that her impairments were relatively mild based on her self-reporting, test results, or presentation. Plaintiff also claims that Dr. Brawer based his findings solely on her interaction with him during the examination. See id. In fact, Dr. Brawer administered multiple tests and based his conclusions on those test results, his observations of Plaintiff, and her responses to his questions. For example, Plaintiff told him that she got along well with people she came into contact with on a daily basis. See AR 270. While her psychiatric history suggested proneness to lapses "in impulse control and judgment," her responses to questions (e.g., what would she do if she were lost in the forest) reflected decent judgment. See AR 271. Dr. Brawer noted that she was capable of simple tasks but exhibited problems with anger control, which "may result in at least moderate limitations in ability to manage customary work stress." AR 274. Those limitations were reflected in the ALJ's RFC.

On a dime, Plaintiff turns and argues that the ALJ did not give Dr. Brawer's opinion enough weight, because the ALJ did not restrict Plaintiff's contact with supervisors and co-workers. See JS at 12. But Dr. Brawer opined only that Plaintiff "may" function "most optimally" in a semi-isolated work setting and "may" have mild-to-moderate limitations in sustaining cooperative relationships with co-workers and supervisors. AR 275. The agency medical consultants similarly opined that Plaintiff had moderate limitations in getting

along with coworkers without distracting them or exhibiting behavioral extremes. See AR 289, 337. Dr. Brawer also concluded that Plaintiff related in an appropriate manner "with supportive authority figures." Id. Furthermore, the jobs identified by the VE—cleaner, small parts assembler, and hand packager—would not call for significant interactions with coworkers and supervisors, reflecting the RFC's limitations to simple job instructions, no directing others, non-complex routine tasks, and no fast-paced production requirements.

Plaintiff argues that the ALJ gave improper reasons for giving "great weight" to the two agency medical consultants. See JS at 13. Plaintiff cites no authority for the proposition that it was error for the ALJ to note the consultants' familiarity with agency rules and regulations. In fact, cases routinely cite consultants' familiarity with the disability legal framework as a basis for giving their opinions weight. See, e.g., Hamm v. Comm'r of Soc. Sec., No. 16-01098, 2017 WL 4173787, at *5 (D. Ariz. Sept. 21, 2017) (upholding ALJ giving significant weight to consultants where ALJ noted that consultants were "familiar with the requirements for determining disability"). And as the ALJ noted, the two opinions were consistent with the overall record of treatment in that nothing in the record suggests that she had more than moderate functional limitations due to her mental impairments.

Finally, Plaintiff claims that the ALJ misstated Plaintiff's limitations in activities of daily living, pointing in particular to evidence that she is unable to manage funds or keep her immediate environment clean. See JS at 13-15. But neither of these alleged limitations would affect her ability to perform the basic work activities permitted by her RFC. Plaintiff criticizes the ALJ for citing Plaintiff's use of social media and the telephone on a daily basis, a "solitary activity," as "some type of success" in social functioning. JS at 14. These interactions with others are not "solitary" activities simply because they are

not done face-to-face. Plaintiff claims that the ALJ relied only on Plaintiff's having "adhered to proper hearing decorum" as "representative of her ability to maintain appropriate functioning in the workplace fulltime." Id. In fact, the ALJ cited Plaintiff's decorum to support his conclusion that she had moderate limitations in social functioning; he relied on other evidence in the record, including physician opinions, in formulating Plaintiff's RFC. See AR 21-26.

In conclusion, Plaintiff has not shown that the ALJ's RFC was unsupported by substantial evidence or based on legal error.

**D. Subjective Symptom Testimony**

To determine whether a plaintiff's testimony about subjective symptoms is credible, an ALJ must engage in a specific two-step analysis. See Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009) (citing Lingenfelter v. Astrue, 504 F.3d 1028, 1035-36 (9th Cir. 2007)). First, the ALJ must determine whether the plaintiff has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the alleged pain or other symptoms. See Lingenfelter, 504 F.3d at 1036. If the plaintiff meets the first step and there is no affirmative evidence of malingering, the ALJ must provide specific, clear and convincing reasons for discrediting the plaintiff's complaints. See Robbins v. Soc. Sec. Admin, 466 F.3d 880, 883 (9th Cir. 2006). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the [plaintiff's] complaints." Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as amended) (citation omitted).

In a December 2013 function report, Plaintiff claimed that on a typical day, she had a shower, watched television, and used social media all day. See AR 179. She had no difficulties in personal care but needed reminders to take medication. See AR 179-80. She cleaned and did laundry. See AR 180. She used public transportation and could go out alone, and she shopped in stores

twice a week for a couple of hours although she "cannot count money and don't know the value." AR 181. She liked to listen to music, talk on the phone, sing, and dance. See AR 182. When asked to explain her problems getting along with family, friends, neighbors, or others, she wrote only, "I feel like I have been abandoned by my mother." AR 183. She wrote that "everything is the same" with respect to social activities before and after her impairments began. Id. She could only pay attention for ten minutes and could not follow written instructions at all, although she was "pretty good" at following spoken instructions. Id. She did not get along "at all" with authority figures. AR 184.

     At the hearing, Plaintiff stated that she could only stand for one hour and walk for 25 minutes (although she listed no physical impairments on her function report). See AR 38; see also AR 183. She could not work because she "can barely get along with people for about a short time" and would "act out of impulse." AR 38. She took medication but did not see a therapist, although she was "currently looking" for one. AR 39. She was not taking her diabetes medications as prescribed due to her inability to take responsibility for her actions. See AR 40. She had been hospitalized once or twice in the past year for saying that she was going to hurt herself. See AR 42. She sometimes would "scream at the top of [her] head for no reason" and yell, kick." AR 43. She had a boyfriend but could "barely stand him." Id. She could not sleep at night. See id. She never argued with teachers or staff at school, but she did argue with classmates. See AR 44. She recently was put on a "shot" that lasted a month for her mental impairments, because she was being "irresponsible" and not taking her medication regularly. AR 45. The medication helped her "a little bit, but not as much." Id. She did not shower on a normal basis, but then stated that the longest she goes without showering is a day. See id. She could not perform even an isolated, physically undemanding job because she does not "know how to follow directions properly." AR 46.

14

The ALJ incorporated some but not all of Plaintiff's subjectively-described limitations into her RFC. See AR 25. The ALJ concluded that her more extreme statements were not consistent with the medical evidence. See AR 24. He also observed that she received conservative treatment for her mental impairments, she was occasionally non-compliant with her medication, and her mental health treatment record demonstrated that her symptoms could be effectively addressed with treatment. See AR 24-25.

The ALJ gave specific, clear and convincing reasons for discounting Plaintiff's testimony. First, the objective medical evidence did not support Plaintiff's claims. None of the physicians who opined about Plaintiff's mental impairments assessed more than moderate limitations. Even Plaintiff's own treating physician, Dr. Cruz, concluded that Plaintiff's mood and behavior symptoms only mildly or moderately interfered with her daily social function. See AR 311.

Second, the ALJ correctly noted that Plaintiff's mental health treatment was mostly conservative in nature. Notably, Plaintiff testified at the hearing that she was not seeing a therapist, despite her claims of disabling mental impairments. Plaintiff's records show that her treatment was limited to medication except for occasional brief hospitalizations related to altercations with family members.

Third, the ALJ observed that Plaintiff was non-compliant with her medications, despite evidence that her mental health impairments could be effectively treated. For example, in April 2015, Plaintiff stated that she did not take her Clonidine prescription because she did not believe that the medication worked. See AR 499. When Latuda was prescribed instead, Plaintiff admitted that she simply had not picked up the Latuda because she was "doing well with no medicine." AR 500. While some other evidence suggests that Plaintiff's mental impairments contributed to her non-compliance, taken

together, the ALJ's reasons were sufficient to discount Plaintiff's subjective symptom testimony.

## III. CONCLUSION

For the reasons stated above, the decision of the Social Security Commissioner denying benefits is affirmed.

IT IS SO ORDERED.

Date: May 30, 2019

DOUGLAS F. McCORMICK
United States Magistrate Judge